Total boomer thing to do. Okay, well, thanks for joining us via Zoom today. We appreciate the opportunity to do it this way. Judge Ebell and I are probably in Denver. Judge Moritz is probably in Kansas. Don't know where counsel are. Hope it's someplace nice. And we are going to have 15 minutes per side as the court criers indicated, and then we'll adjourn. So today's case is 22-4117 Fibro Biodigester v. Murphy-Brown. And for the appellant, Mr. Moritz, you may proceed. Thank you. Good morning, your honors. Alan Moritz on behalf of Fibro Biodigester. I will aim to reserve three or four minutes for rebuttal. The district court assumed that the ARMSA was a requirements contract. It assumed that the unique good, and it assumed that Fibro would not be able to cover for the loss of that good. It nonetheless held that there was no irreparable harm here, and it abused its discretion in doing so. Before I delve further into the merits, though, I would like to take a few minutes and explain why this appeal is neither constitutionally nor prudentially moot. Constitutional mootness imposes a high bar. It requires the court to conclude that it is impossible to grant relief that would have a real-world effect to the parties. Murphy-Brown has not carried its heavy burden to make that showing here. According to paragraph 5 of Mr. Moritz, it continues to hold sows, boars, and piglets at the complexes, and it is our understanding that Murphy-Brown transports piglets and finishers all across the country. Are they holding anything like the volume of piglets that were held before they shut down proceeding? It is our understanding that there are about 40,000 sows still at the complexes, and that we don't know who to be honest. You mean the facilities that would have served the pipeline that would have accommodated Fibro's business? You say there's 40,000 sows still there? I just want to be clear about this. It's our understanding there are 40,000 sows at the sow barns, not at the finisher barns. Right, and it was the finishing barns that had the pipeline to it. That's right. Are there any sows at that finishing barn? No, there wouldn't be sows at the finisher barns because they're not finishers, they're sows. Yeah. But it is our understanding that there are piglets being held at the finisher barns before they are being transported to Nebraska. Okay, go ahead, proceed with your argument. Thank you. No, our only point is that the district court assumed for purposes of its ruling that it would be requiring Murphy Brown to take affirmative steps to have finishers at the finisher barns. And so that is the posture that we are before this court, that Murphy Brown is going to have to take steps. They're going to have to inseminate sows, they're going to have to enter contracts with farmers, they're going to have to replenish, in the district court's words, replenish the finisher barns. And all of that remains live, that that is a live issue before this court. According to the most recent scheduling order, we're no closer than 16 to 18 months to trial in this case, and that assumes no extensions. And given Murphy Brown's resources and common practices, there's no reason to believe that can't repopulate the finisher barns in short order. If the court, you know, if we reverse and the district court orders the replenishment of the finisher pigs, what's your response to the argument that Murphy Brown lost its purchaser, California purchaser, and therefore, you know, its business model has been disrupted because it doesn't have the same customer support to sell its product, you know, the meat product, the pig product, as opposed to the waste product. What's an injunction going to do if there's not a reliable purchaser of the finisher pigs? Well, we don't know that that's the case. I mean, we know that that's what Murphy Brown represented, but if we, I assume you're talking about the balance of the equities, that inquiry isn't relevant to any other factor, but they are parties to a 20-year requirements contract. And to the extent the court agrees with us that the district court abused its discretion on the irreparable harm analysis, we will have been irreparably harmed if they are allowed to shut down, and they will have suffered some level of damages that they might be able to prove. But in terms of the balance of the equities, irreparable harm always outweighs monetary damages. What does the record reflect about your irreparable harm? You're a big company. Why does the record, does the record negate the possibility that after 18 months in a trial that you could, you would have the resources to restart if you could get the supplies? Well, first of all, I don't know that I would necessarily characterize us as a big company. I think my only point is preliminary injunction requires four factors. The showing of irreparable harm is that we are being denied a unique good, and a unique good by definition is irreplaceable. You can't quantify its value. And that's what the district court assumed about the manure that we were being deprived of here. And so if we're being deprived of a unique good that you cannot value, every day that passes, we are suffering irreparable harm. And we will suffer irreparable harm every day between now and the start of trial. And so that's, that's what the record shows. That's what the district court assumed. Well, now, the district court also... Excuse me. Oh, sorry. Go ahead, Judge Moritz. Oh, okay. I was just going to say, I mean, the district court did assume it was a unique good, and also assumed that you couldn't cover. But the court said that wasn't sufficient to show irreparable harm. And it pointed out that you have plenty of data here, accumulated data from which to, to determine your loss, should you need to do that. I don't, I don't, I guess I don't understand why the simple fact of the unique good prevents you, or the fact that you can't cover at this point, prevents you from still being able to calculate a loss, which is really what the district court came down to here. Monetary loss is calculable, calculable based on your own records. Here's the problem with that analysis. Under the UCC, there are two components of damages. We're entitled to the lost value of the good, in addition to whatever profits, or lost revenue, or other consequential damages we're entitled to. And so the district court said, well, you have your historical performance that shows your lost profits over the course of four or five years, but there's no discussion of the lost value of the good, the manure itself. And that's UCC principles that say under 712 and 713, you get to go purchase a substitute good on the market, and you get to recover the difference between the value of what you purchase as a substitute, and, and the good that's not being deprived. The other problem with, so, let me, let me ask you a quick question. You said there's two, there's the loss of the unique good, plus consequential damages, but does the contract allow you to claim consequential damages? No, and that only strengthens our point. The contract precludes that, right? It says no consequential damages. The contract says no consequential damages, so literally our only remedy here is to be able to try and recover our cover damages, or our market price differential damages, the difference between the value of the manure on the market and the value of the manure as we were paying for it. And the problem is that the court said you can't acquire substitute manure. There's no market for that manure. That's the assumption when he says it's a unique good you cannot cover. Well, then how are we supposed to recover our damages? By looking to your past history of, of what your $150,000, uh-huh, facility. Two responses, Judge Moritz. One, the contract precludes us from recovering those profits. Okay. And two, those are different than our cover damages. The UCC is clear. We get our cover damages, the difference between the value of the good on the market and what we were paying for it. That has nothing to do with profit. It's just an input, right? It's an input for the way we're operating our business. The UCC says the default is you can also recover your consequential damages. Here we can't recover our consequential damages because they're barred. So our historical performance shows nothing about the value of the manure on the market, which is the way the UCC measures our direct damages. And so Judge Shelby just skipped over this analysis. He said, yes, it's unique. Yes, you cannot cover. Yes, it's a long-term requirements contract. And yet, despite all that, I'm going to rely on these other provisions of the contract and the idea that you can calculate your damages. And that's why we think it was such an error for the court to say it's a straightforward calculation of your damages, while at the same time suggesting that the manure was irreplaceable because it was unique. Well, we get the value of that manure. That's our bedrock remedy under the UCC. The only other thing the district court said is that the ARMSA itself weighed against specific performance. And for the reasons we laid out in our brief, we just don't think that's a plausible reading of the ARMSA. There is no provision in the To the contrary, 1333 expressly anticipates that either party is going to be able to come into court and seek an equitable remedy. May I ask you a quick question? And I'm sorry to interrupt at this point, but it's real important to me. Under the UCC, as adopted by Utah 70A 27082, lost profits can be the basis for damages if you are the seller. But it does not, but there's no comparable provision if you're, if the plaintiff is the buyer. Do you have any explanation for why the UCC made that distinction between buyers and sellers? Why did they? I apologize, Judge Ebell. I actually think, and I might have to double check the citation, but I actually think 715 may authorize the buyer to receive, it doesn't say lost profits, but I believe it does say incidental and consequential damages, which I would argue lost profits falls within. But of course here, we're precluded from recovering those under the terms of the ARMSA. And I endeavor to reserve the rest of my time for rebuttal if that's okay. All right. May counsel, let's hear from Mr. Toth when you're ready. Thank you, your honors. May it please the court. I would like to begin, I think talking about, because I do think it matters. I'd like to begin talking about credential and article three mootness. And I'm going to talk very briefly about the district courts, the standard of review here and the district court's analysis of a standard review for a preliminary injunction. And then I'll touch on the court, on the district court's analysis of irreparable harm and the balance of the harms. I want to start by going back to the Cato case. Obviously the court's very familiar with that case, but just to touch on the facts of that case, I think it's relevant for our argument here today. The Wichita tribe was, as you know, building a history center on its own land. The Cato nation filed suit under the NHPA and NEPA, alleging that the building could be on lands with ancestral remains. And they sought a TRO to prevent construction. That was the sole remedy they requested at the district court level that was denied. It was an appeal that they appealed the TRO to the 10th circuit, but did not seek any other relief below. One year later, the history center was finished and the appeal of the TRO was considered by the 10th circuit. The analysis by the 10th circuit in Cato carefully explained why the tribe's appeal of the preliminary injunction was moot. Specifically, the only relief sought in the TRO was to enjoin construction of the history center. To avoid the mootness argument, Cato nation argued that it could still seek, quote, to enjoin the history center's use to the extent it might disturb ancestral remains in the area. In other words, they were still trying to focus on their ultimate goal, but they had shifted the type of relief they were requesting. But the Cato court pointed out that this relief was not sought in the TRO, and the court said, we thus constrain our analysis to the relief the Cato nation sought below, a temporary restraining order on construction of the history center. The court concluded saying this relief is now impossible and dismissed the appeal on mootness grounds. The court rejected Cato nation's request to, quote, expand the request for injunctive relief to fashion a remedy. This case sits squarely within Cato's reasoning and holding. In our case, the district court's order explicitly recognizes that FIRO's request sought an order to either maintain a hog population or prevent depopulation, period. In other words, the record before this court, there's no question that FIRO sought only to maintain a population of approximately 400,000 finisher hogs at Murphy Brown's facility. That's the scope of the injunctive relief below. There are now no finisher hogs at Murphy Brown's complex, and Murphy Brown logically cannot be ordered to maintain a population of hogs that doesn't exist. That's just a factual reality. Why can't we construe, I mean, they could replenish the hogs. Why isn't that fairly contained within the maintenance option? Assuming there'd been an injunction for 400,000 hogs, when it went below 400,000, I guess the court could order some type of relief to replenish that, the delta between what the actual and what the target number was. Why isn't that fairly encompassed within the requested relief? It's a fair question, Your Honor. Let me address it this way. Let me, from a purely factual standpoint, Murphy Brown could rehire the hundreds of employees, begin to restart re-inseminating sows, try to locate new contracts to supply those. It would require an enormous factual lift, but it's not factually impossible to do that. The issue, simply from a legal standpoint, is that's not the relief that was requested. Temporarily, that time period has passed. In fact, that time period effectively had passed by the end of December after the preliminary injunction was denied. The appellant said that there were still hogs there at the facility. What does the record show about whether that's true, and if so, how many? My understanding, Your Honor, is there are approximately 30,000, mostly sows, and there are approximately 200 to 300 hogs and or piglets. That's my understanding of the factual state of play. Is that the record before us? We can't cite your understanding. We have to cite things in the record. Is that in the record? I believe that's in the record, Your Honor. I can't point to that site immediately. If it's in the briefing, it would be referenced to the record. Thank you. Why isn't it clear that what they're seeking is a mandatory injunction, as the district court said? They're seeking to, however you want to call it, whether it's using the word maintain, they're seeking to restore the status quo, and that requires a mandatory injunction, and that's what they're looking for. Despite the practicalities of that, that seems to be something that can be, you know, they can do that, I guess is what I'm trying to say, and I don't understand your argument that this is anything like the case with the constructed building. We're not talking about now tearing a building down. We're simply talking about repopulating the facility with the hogs. That's an entirely different seek there. So let me approach this, Your Honor, with when the district court granted the relief, because I think the context matters in time here. What the district court was considering, when it considered it, there was actually a population of 400,000 hogs. The only relief requested was to maintain that population. Now they're asking, and by their own briefing, they ask it for a repopulation order. Now the district courts did treat this as a mandatory injunction, but Judge Shelby treated it as a mandatory injunction because in order to effect the prohibitive relief that they wanted, in other words, there are 400,000 hogs. I want, in order to maintain that, it would require affirmative action by Murphy Brown to do so. Obviously the maintenance of the employees, maintenance of the hogs, and a continued operation. So the court, I don't believe the court saw this at all as requesting affirmative relief. It simply said there were affirmative acts that had to be taken in order to grant prohibitive relief, and that's what was sought. To say, Your Honor, that, well, obviously you ultimately could put more hogs in those farms. I can't deny that that could be done, but there is a multi-million dollar, you know, impact to Murphy Brown, and it is forcing Murphy Brown to operate a non-profitable business, which is what the district court found in the balance of harms analysis. Could you address his argument about the assumption as far as this being a unique good, and the fact that FIBRO can't cover the loss, and why does this, they argue this demonstrates on its own, at least under the UCC, irreparable harm here under the circumstances of this case. Can you address that? Yes, Your Honor. I believe that's sort of a reductionist fallacy here. I agree that the court, the district court, gave them credit for and said this is a unique good, and that they might not be able to cover, but that doesn't alter the proper analysis, which is what the district court did, which said, I'll give you that as a factor, and I'll weigh that in your favor, but I'm going to look at all of these other aspects of the ARMSA, your inability to present proof at trial, and your inability to show that, in fact, you would go out of business, and your inability to show that your damages were incalculable, and the court said, when I balance all that together, I can't weigh that, I can't have that one single factor outweigh what I am required to do under Rule 65, which is to balance the totality of the circumstances. So, I do think they made that argument. I'm not, for purposes of this appeal, we're not disagreeing with that. I just, it's a reductionist flaw, because they're still, what they're essentially saying is the district court's error was it didn't give enough weight to this one factor, as opposed to all the factors and evidence it did give weight to. Well, they're saying there wasn't any discussion at all of the lost value of the goods by the district court. That basically, it's not just a lack of giving it enough weight, that it didn't give it any weight. And I would disagree with that argument that they've made. The district court did talk about historical performance, historical cost of goods. Now, if their argument is, well, it's a unique good, that doesn't mean its cost is unknowable. What that means is that it may be difficult to calculate, but that doesn't mean there isn't still a delta to be calculated. If the delta is whatever that value is, then they're still able to calculate a delta, which shows their damages. This isn't a matter of trying to create a measure for a contract. The question is, can they show damages for what they are alleging that is occurring here? And their allegation is that this business is valueless. Is there a risk to Murphy Brown that you may get what you ask for? I mean, if you end up back, no injunction, but damages, and they calculate, okay, we'll look at the replacement value, which is getting manure to this site, you guys might face a truly enormous damages amount. Your Honor, I don't know that. Let me answer your question. Is that a possibility with the argument they've made? Yes, I'm sure they will argue that that is an astronomical number, but that doesn't get them over the hurdle here for a preliminary injunction to show that their Can you answer very quickly, just in a sentence, why the UCC appears to differentiate between sellers' damages and buyers' damages, and only sellers' damages are given lost profits and not buyers? Why? Your Honor, I cannot answer that question without, I honestly do not know the answer to the question, and I don't want to speculate on what the framers of the UCC know. That's all I need to know. Thank you. I'm sorry. It's a mystery. I'm sorry. Could you comment on Mr. Morrison's argument that they can't get consequential damages here under the contract, and, you know, that kind of shifts the irreparable harm analysis in their favor? In our view, Your Honor, it doesn't, and here's why it shouldn't. Both sides have contracted away certain rights. You don't get to create irreparable harm for yourself by contracting away those rights. I think that's particularly applicable in this case. You have two very sophisticated parties. When this agreement was initially negotiated, two very sophisticated parties negotiated that term into it. When FIBRO purchased this contract and purchased the rights to perform this contract, they had a long due diligence period. They were able to review the business with counsel. They know those terms are there, and to now say, oh, well, we should be able to count the fact that we can't get consequential damages as irreparable harm simply flies in the face of that sophistication. It also flies in because, and this was the district court's point, the parties negotiated specific terms in that arms that relate to the UCC. One of them also was, and we're all familiar with these provisions and contracts, there's no provision in there that either says breach of the agreement constitutes irreparable harm or that breach of the agreement should provide a route to specific performance. So now basically what they're doing, Your Honor, is picking and choosing. Well, because we don't have a right to consequential damages, that should be irreparable harm, but never mind the fact that we failed to put in a provision that says breach of the contract constitutes irreparable harm, and one would think if you knew you couldn't get consequential damages and you thought that would cause irreparable harm, you certainly would have put in a provision that said, but breach of the contract is irreparable harm. Judge Shelby pointed that out in his order at the district court level as a factor that militated heavily against granting the preliminary injunction. So let me move on, Your Honors. I'm going to jump quickly to, we've covered the uniqueness argument and I have about a minute to go. So I'm going to focus really quickly on what I think is the fundamental flaw in the appeal, which is that this is a carefully written order, and it's an heightened showing, and I mentioned that I would touch on this when I began my argument. That's a heightened showing, and Judge Shelby actually gave FIBRO the benefit of the doubt on a lot of its key arguments and said, I'll count those arguments on your side of the column. But the court then went through and looked at each of these elements, and the majority, almost uniformly, the problem with FIBRO's case was they didn't have the proof to carry their burden. This is not an error of law, and it carries where the court mischaracterized the evidence. It's clear that FIBRO didn't have the evidence, and that's why the preliminary injunction was denied, and we would ask the Tenth Circuit in this court to affirm that. Thank you. Thank you, counsel. Mr. Morton, you have some rebuttal time. Thank you, Your Honor. I'd like to focus on two quick points. The first has to do with the cattle case. As you pointed out, Judge Moritz, the entire framing of this injunctive relief request was supplying the manure that we are contractually entitled to. If you read pages 1882 through 1887 of our motion for a preliminary injunction, you will see that we are asking the court to order Murphy Brown to supply us the manure we are entitled to. Ordering them to have finishers at the finisher barns undoubtedly provides us the relief that we were asking the district court for. Second. If we reverse an injunction put in place, how is the district court going to manage an injunction in these circumstances? It seems almost like they're going to be involved in the day-to-day operations of a fairly complex agricultural business. How is that going to work? It's going to be seamless. There are very few individuals involved in the process. They're connected by a pipeline. As long as the finishers are there, the manure will travel to the facility. There's no real micromanagement that will be required. The court didn't suggest otherwise in its ruling besides saying that this would require a mandatory injunction. If I could just point out, the district court's order is internally contradictory because the court, again, says that the value of the good is unique and that febrile cannot cover. It is ignoring our cover damages and only talking about our consequential damages. Our point is not that the limitation of liability clause on its own creates irreparable harm. Our point is that the limitation of liability clause, in addition to the district court ignoring our cover damages, it's the inability to calculate our cover damages that constitutes irreparable harm. We can argue for an astronomical damages number, as Judge Ebel pointed out, but even that's not consistent with what Judge Shelby held, which is that it's a unique good that's irreplaceable. And with that, we would ask the panel to reverse and remand for further proceedings. All right. Yeah, thank you, counsel. We appreciate the arguments by Zoom today. It worked pretty well. You are excused and the case will be submitted. For the panel, I sent a separate Zoom link for our conferencing, which I think is at 1045. Thank you. Thank you. Court is in session.